```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA            :
                                    :
                                    :   06-cr-580 (JSR)
         -v-                        :
                                    :   MEMORANDUM ORDER
                                    :
CHAZ GLYNN,                         :
                                    :
         Defendant.                 :
                                    :
------------------------------------x
```

JED S. RAKOFF, U.S.D.J.

Between 1993 and 2000, Chaz Glynn was the leader of a unit of the Bloods street gang in the Bronx that distributed hundreds of grams of crack cocaine and defended its territory through acts of violence, including the murder of Frederick Fowler and attempted murder of Charles Myers on May 22, 2000. In 2008 Glynn was convicted of murder in aid of racketeering, (which carried a mandatory sentence of life imprisonment), murder in connection with a drug conspiracy (which had a mandatory minimum sentence of twenty years' imprisonment), and the use of a firearm in relation to a drug trafficking crime resulting in murder (which had no mandatory minimum). On January 28, 2009, this Court sentenced Glynn to life imprisonment on the first count and 480 months on each of the other two counts, with all three sentences to run concurrently.

Now before the Court is Glynn's motion for a reduction in sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). ECF Nos. 280, 282. Glynn filed a pro se motion for a reduction in sentence and

1

appointment of counsel. See ECF Nos. 276-77. The Court appointed counsel under the Criminal Justice Act to supplement the motion, and it has been fully briefed. See Mem. in Support, ECF Nos. 282-83; Mem. in Opp., ECF No. 284; Reply Mem., ECF No. 286; Supp. Mem. in Support, ECF No. 289. On December 2, 2021, the Court heard oral argument on the motion and took the matter under advisement. The Court now grants in part Glynn's motion for a reduction in sentence, and his sentence is modified to reduce the term of imprisonment on Count One from life imprisonment to 420 months, and on Counts Two and Three from 480 months to 420 months, all to run concurrently, for a total of 35 years. All other aspects of his sentence remain in full force and effect.

**FACTUAL BACKGROUND**

**A. Glynn's Upbringing[1]**

Glynn's home life growing up was challenging. His father engaged in drug dealing and was arrested and imprisoned, after which his mother fell into drug addiction, leading to arrests and periods of incarceration. Glynn's older half-brother left the home when Glynn was ten years old, leaving Glynn with a profound sense

---

[1] The Court authorized Glynn's counsel to retain a mitigation specialist, Renee Kuhn, LMSW. Kuhn prepared a detailed narrative of Glynn's life based on documentary evidence and interviews with many of Glynn's friends, family members, and acquaintances. The Government does not dispute the report. For purposes of this motion, the Court credits it, unless otherwise noted.

2

of abandonment. Glynn first observed drug use by his mother and fellow drug users in the apartment where they lived, then eventually was encouraged by his mother to supply her with drugs, driving him to life on the streets by his mid-teens. Glynn routinely witnessed acts of violence in the neighborhood where he grew up, including numerous shootings and at least one murder. While adults at Glynn's middle school found him respectful, cooperative, and enthusiastic for opportunities that offered an alternative to being at home, he lost those relationships and support when he transferred to an underperforming high school with serious school safety problems and a low graduation rate. At age 15, Glynn began using marijuana regularly and began selling drugs. At age 18 and 19, he was arrested and convicted for selling drugs, and he then dropped out of school. Glynn was in state custody a few years later when his daughter was born, and when he was released, he helped support his daughter and her mother, as well as Glynn's own mother, primarily through selling drugs.

**B. The Offense**

As developed in the trial before this Court and a jury (held in September and October of 2008), between 1993 and 2000, Glynn was the leader of a unit of the Bloods street gang operating in the Bronx that distributed hundreds of grams of crack cocaine and defended its territory through acts of violence, including the murder of Frederick Fowler and attempted murder of Charles Myers

3

on May 22, 2000. Two witnesses testified at trial that Glynn ordered them to kill Fowler and Myers and that the killings were a means by which Glynn and others could solidify their positions within the gang.

A non-Bloods associate of Glynn's, Keith Valentine, had been selling cocaine to Myers for about two years. Valentine shorted Myers in a cocaine transaction, and while he told Myers he would make it up, Valentine instead hatched a plot to rob and murder Myers. Valentine asked Glynn for help robbing and killing Myers; Glynn agreed. On the day of the murder, Glynn told two Bloods associates, Eddie Kline and Freddie Robinson, that he had work for them. Glynn took them to his apartment, gave them each a firearm, and told them they had to shoot Myers and Fowler (who was with Myers for the arranged transaction), and to "make sure that [they] had killed them both" because they knew where Valentine lived. Glynn told Kline and Robinson this would help their positions within the Bloods, because they would get money from doing it, which would in turn allow them to get more guns and drugs, which would bolster their status. Later that day, Kline and Robinson approached the car where Myers and Fowler were sitting. Robinson fired; Kline did not. Robinson hit Fowler, who was taken to the hospital and died.

4

**C. Trial and Sentencing**

Glynn was already serving a federal sentence (after pleading guilty to being a felon in possession of a firearm and in possession of drugs with intent to distribute) when he was indicted and arrested for the offenses underlying this sentence on August 8, 2006.[2] Glynn was charged, along with two co-defendants, on three counts: murder in aid of racketeering, murder in furtherance of a drug-trafficking offense, and use of a firearm in furtherance of a crime of violence and a drug-trafficking offense that caused the death of another person.

Glynn's first trial, in June and July of 2008, ended in a mistrial when the jury could not reach a unanimous verdict. In the second trial, held in September and October of 2008, the jury returned a guilty verdict against Glynn on all three counts. The murder in aid of racketeering count carried a mandatory sentence of life imprisonment, the count of murder in connection with a drug conspiracy had a mandatory minimum sentence of twenty years, and the count of use of a firearm in relation to a drug trafficking crime resulting in murder had no mandatory minimum. On January 28, 2009, Glynn was sentenced to life imprisonment on the first count and 40 years on each of the other two counts, with all three sentences to run concurrently.

---

[2] For that offense, Glynn had been arrested on September 15, 2000, and was sentenced to 97 months' imprisonment.

In denying Glynn's challenge to the constitutionality of mandatory life sentences, the Court stated that "[w]ere this matter before me in a situation where I thought I had any flexibility as a matter of law, I would seriously consider many of the arguments made by defense counsel as to the unlawfulness or unconstitutionality of the mandatory minimums. But this is regretfully a matter on which in my view I do not have such discretion." Sent. Tr. 4:22-5:2. The Court further noted that in terms of mitigating circumstances in the context in which Glynn's life played out, "I don't see what purpose under Section 3553(a) these circumstances would be served by saying as I must under Count One in effect to this defendant 'the prison door will never open for you.' To my mind this is not a human being who is beyond salvageability so to speak. He must be severely punished because he has committed as bad a crime as one can, the crime of murder, and murder moreover in the most calculated and tawdry of circumstances." Sent. Tr. 6:25-7:12. The Court went on to comment that "[i]n his comments, Mr. Glynn once again makes clear his intelligence, and it did bother me a great deal that there is a mandatory life imprisonment count here. I think the notion in that there are human beings whose misconduct is so extreme that they are beyond redemption can surely apply only in a very limited number of cases and I do not honestly think it applies to Mr. Glynn." Sent. Tr. 18:23-19:4.

As for the second and third counts, the Court found that distinguishing between Glynn and Valentine was appropriate, noting that although Valentine proposed the idea, Glynn had the means through the gang and his position in the gang to recruit Robinson and Kline to carry out the murder. Sent. Tr. 18:8-23, 13:3-20. As such, the Court was "persuaded that no sentence short of 40 years can fairly reflect the factors under Section 3553(a)." Sent. Tr. 19:8-23.

Three other defendants pleaded guilty in connection with the murder. Valentine instigated and planned the killing, and recruited others to participate in it, and was sentenced to 330 months in prison. Kline and Robinson were government witnesses at Glynn's trial and were sentenced to time served in 2009.

**D. Rehabilitation**

Glynn has been in custody since 2000, though first serving a 97-month sentence on charges in another case. Glynn renounced his gang membership and is housed in a gang dropout unit. ECF No. 282-3 at 13. Glynn has consistently held jobs during his time in prison and demonstrated a solid work ethic. He has participated in education and programming courses and sought to improve himself through self-study. Although Glynn has had disciplinary infractions over the years, he has had only three infractions in the past seven years. Two were minor (possessing unauthorized postage stamps and failing to keep his cell tidy during an

7

inspection). One was a physical altercation, though Glynn was not the initial aggressor and later reconciled with the other inmate.

Correctional staff attested to Glynn's rehabilitation and desire to contribute to society. His BOP counselor, Daniel Flores, wrote of Glynn's "integrity," "punctuality," and "high standard of maturity and discipline," in carrying out his work as a janitor, describing Glynn as an "outstanding team player" who "has displayed a high degree of tact and diplomacy when dealing with other inmates and staff." ECF No. 282-5 at 12. Flores further noted that Glynn's "attention to detail and positive behavior has been recognized by the Psychology department as well as the unit team staff," and that Flores "would highly recommend Mr. Glynn to whichever position he applies in the future." Id. Flores said that Glynn was one of the few inmates on his caseload that Flores would recommend for release: "I have over 200 inmates on my caseload and Chaz is one of the few I would recommend for release. He is always very respectful. When he comes to me for something, I know it is legit and he's not playing games." ECF No. 282-3 at 10. Senior Officer R. Sheriff wrote of Glynn's positive outlook, strong relationship with his daughter, and how Glynn is "hungry for the opportunity to become a productive member of society." ECF No. 282-5 at 13.

Glynn's fellow inmates also attested to Glynn's rehabilitation. Two inmates, Miguel Morancy and James Mozie, who both work assisting inmates with mental illness, wrote of how Glynn

8

relates in a respectful and non-condescending way to the inmates in their care, and that even though it is not part of his work duties, Glynn has helped to peacefully resolve conflicts between these inmates. Morancy wrote that Glynn is "very active in the prison community" in a positive way, including counseling Morancy about personal issues Morancy was having with his family. ECF No. 282-5 at 14-15.

Glynn's family and friends also spoke to his rehabilitation. Glynn's brother Aerion wrote that Glynn's attitude has changed over time, and that Glynn feels shame and regret about his participation in gang activity, noting that he has "seen how Chaz has grown up to be a very different person in jail." Id. at 3. Glynn's family and friends wrote of how they would support him if he were to be released. Freddie Charles, a program manager for an anti-gun violence program, wrote that Glynn "has a very good chance to be trained and employed by [his] organization." Id. at 11.

## **LEGAL STANDARD**

The compassionate release statute, as modified by the First Step Act, provides that after certain administrative exhaustion requirements are met, and after considering the factors enumerated in 18 U.S.C. § 3553(a), "the court . . . may reduce the term of imprisonment . . . if it finds that — extraordinary and compelling

9

reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). This includes authorizing a district court to reduce, though not eliminate, a defendant's sentence. See United States v. Brooker, 976 F.3d 228, 237 (2d Cir. 2020).

A Court evaluating a motion under this statute must ask four questions: (1) has the defendant complied with the administrative exhaustion requirement, (2) has the defendant shown extraordinary and compelling reasons warranting a sentence reduction, (3) are the 18 U.S.C. § 3553(a) sentencing factors consistent with a lesser sentence than that previously imposed, and (4) is there a particular sentence reduction consistent with the § 3553(a) factors that is also warranted by extraordinary and compelling reasons? See United States v. Garcia, 505 F.Supp.3d 328, 330–31 (S.D.N.Y. 2020).

## ANALYSIS

### I. Administrative Exhaustion

Glynn has satisfied the administrative exhaustion requirement because he requested compassionate release from the warden of his facility, who denied the request, and more than a month has passed since Glynn's request. See ECF Nos. 276–77.

## II. Extraordinary and Compelling Reasons

Glynn argues that, taken cumulatively, the following circumstances constitute extraordinary and compelling reasons warranting his immediate release: Glynn's upbringing and young age during the offense conduct; the sentencing disparity between Glynn and his co-defendants and the mandatory nature of Glynn's life sentence; how Glynn's recently diagnosed chronic kidney disease renders the conditions of his confinement more severe, both in terms of increasing his COVID-19 risk and more generally; and Glynn's rehabilitation in the twenty years that he has been incarcerated. While the first two circumstances have not changed since Glynn was sentenced, the latter two do represent changed circumstances since Glynn was sentenced and, taken cumulatively, constitute extraordinary and compelling reasons for a partial reduction in Glynn's sentence.

A. Glynn's Upbringing and Young Age During the Offense Conduct

As described above, Glynn grew up in troubled circumstances, and he committed the offense conduct at the age of twenty-two; Glynn argues that both are among the extraordinary and compelling circumstances warranting his release. There are arguments on both sides about the extent to which Glynn's circumstances and young age at the time of the offense conduct are attributable to the immaturity and susceptibility of youth, but, the Court could and did consider the impact of both Glynn's upbringing and his relative

11

youth at the time of his sentencing in 2009. While the Government argues that Glynn was twenty-two years old, not eighteen, and that the immaturity and susceptibility of youth are not relevant, this Court has made clear that such relative youth is relevant to sentencing and, as discussed at length in United States v. Ramsay, the court can and should take it into account in sentencing a defendant. 538 F.Supp.3d 407, 418 (S.D.N.Y. 2021).[3]

However, as the Court made clear at sentencing, the attributes of Glynn's upbringing and relative youth do not explain away the reality that he committed a calculated murder for personal gain. Similarly, his difficult upbringing and relative youth at the time of the offense conduct do not in and of themselves constitute extraordinary and compelling circumstances that today warrant a reduction in his sentence when considered independently from the other circumstances discussed below.

However, as discussed further below, the Court may now take account of Glynn's upbringing and relative youth at the time of

---

[3] As recognized previously by this Court, research has documented the maturity gap between the development of cognitive capacity as opposed to psychosocial maturity, and that between the ages of 10 and 30, the relationship between age and the level of psychosocial maturity is linear and statistically significant. See Ramsay, 538 F.Supp.3d at 418 (citing Grace Icenogle et al., Adolescents' Cognitive Capacity Reaches Adult Levels Prior to Their Psychosocial Maturity: Evidence for a 'Maturity Gap' in a Multinational, Cross-Sectional Sample, 43 Law & Hum. Behav. 69 (2019) (NIH Public Access Version), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6551607/pdf/nihms-1025357.pdf).

the offense conduct in conjunction with the evidence of his rehabilitation and changed character in the twenty years that Glynn has been in custody -- something the Court could not consider at the time of sentencing -- and this contributes to the Court's assessment of the extraordinary and compelling circumstances warranting a reduction in Glynn's sentence.

B. <u>Sentencing Disparity and Mandatory Nature of Sentencing</u>

Glynn further argues that the disparity between the sentences of Glynn and his co-defendants and the mandatory nature of Glynn's sentence of life imprisonment on Count One constitute extraordinary and compelling circumstances warranting a reduction in his sentence. But, at the time of sentencing, this Court made clear that the differences between the conduct of Glynn and his co-defendant Valentine warranted different sentences, and the Court does not find an argument to the contrary any more compelling today. However, as regards the mandatory nature of Glynn's sentence, the Court observed at the time of sentencing that it did not see that any purpose under Section 3553(a) was served by effectively saying to Glynn that the prison door would never open for him, and specifically noted that, to the Court's mind, Glynn was not a human being who was beyond salvageability. The Court further rejected at the time and still finds that the notion that there are human beings whose misconduct is so extreme that they

13

are beyond redemption can surely only apply in a very limited number of cases, and that it did not apply to Glynn.

The Government asserts that a reduction in a life sentence originally imposed pursuant to a legislative mandate is not appropriate. ECF No. 284 at 9. The Government argues that Congress's intent in imposing a mandatory life sentence for murder in aid of racketeering makes clear that such a sentence is appropriate in light of the nature and circumstances of the offense, the need to promote respect for the law and provide just punishment, and to afford adequate deterrence to criminal conduct. See 18 U.S.C. § 3553(a). But the Government's argument neglects other indications of congressional intent that weigh in the opposite direction -- namely, Congress's more recent passage of the First Step Act, in which Congress determined that modifying the compassionate release statute to allow the sentencing court to consider extraordinary and compelling circumstances warranting a reduction in sentence was consistent with the § 3553(a) factors.

Thus, while the mandatory nature of Glynn's sentence not only does not constitute an extraordinary and compelling reason in itself, it does not contribute to the combination of circumstances that constitute the extraordinary and compelling reasons the Court otherwise finds here, but neither does it prevent other extraordinary and compelling circumstances from warranting a reduction in sentence.

14

C. Glynn's Chronic Kidney Disease

The unforeseeably and particularly harsh conditions of confinement under COVID-19 generally have rendered Glynn's sentence more severe punishment than could have been contemplated when the sentence was imposed. Because of his chronic kidney disease, which was only diagnosed in 2020, these particularly harsh conditions of confinement have been even more burdensome on Glynn: his chronic kidney disease increases his risk of contracting or developing complications as a result of COVID-19 and the conditions of prison confinement make it harder for Glynn to care for condition.[4] There was, in fact, a nearly ten-year delay in Glynn being administered the follow-up test to confirm and diagnose the chronic kidney disease in the first place. See ECF No. 282 at 10-11. While Glynn has contracted COVID-19 previously and has been vaccinated, the emergence of new variants demonstrates that his COVID-19 risk factors remain a concern. Because USP Tucson has not had an overwhelming outbreak of COVID-19 cases since 2020, the impact of Glynn's COVID-19 risk factors does not warrant his immediate release; however, this does contribute to the circumstances that constitute extraordinary and compelling reasons for a partial reduction in Glynn's sentence.

---

[4]   Centers for Disease Control and Prevention, Certain Medical Conditions and Risk for Severe Coronavirus Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

15

D. Rehabilitation

As discussed in more detail above, Glynn has demonstrated a largely exemplary record while in prison, including demonstrating diligence and consistency in the jobs he has held and in pursuing educational opportunities. Glynn has developed strong relationships with staff and other inmates. While his disciplinary record is not spotless, the few minor incidents do not call into question what the prison official who knows Glynn best, his counselor Daniel Flores, attested to, namely Glynn's "integrity" and "high standard of maturity and discipline." ECF No. 282-5 at 12. Flores further noted that he has over 200 inmates on his caseload, and that Glynn is one of the few he would recommend for release. ECF No. 282-3 at 10. Particularly when viewed in combination with Glynn's relatively young age when he committed the offense conduct, the evidence of Glynn's rehabilitation strongly contributes to the overall extraordinary and compelling circumstances warranting a modest reduction in his sentence.

The Government argues that Congress has specifically stated that rehabilitation alone is not an extraordinary and compelling reason warranting a sentence reduction. See 28 U.S.C. § 994(t); see also United States v. Brooker, 976 F.3d 228, 238 (2d Cir. 2020). In this case, however, the Court is not considering rehabilitation alone, but instead rehabilitation along with the other circumstances, discussed above, that together constitute

16

extraordinary and compelling reasons for reducing Glynn's sentence.[5]

In sum, the Court finds that the fact that Glynn's recently-diagnosed chronic kidney disease makes the conditions of his confinement more severe, when coupled with the evidence of Glynn's rehabilitation in the twenty years he has been incarcerated, as well as the fact of his relatively young age at the time of the offense conduct, together combine to constitute an extraordinary and compelling reason for a partial reduction in Glynn's sentence.

### III. The Section 3553(a) Factors

Next, the Court must consider whether a reduced sentence would be consistent with the sentencing factors listed in 18 U.S.C. § 3553(a), the same factors the Court considers when imposing a sentence. In this case, the analysis of the § 3553(a) factors largely overlaps with the extraordinary and compelling circumstances inquiry already conducted.

On the one hand, "the nature and circumstances of the offense" warrant a very substantial term of imprisonment. 18 U.S.C.

---

[5] The Government further argues that Glynn's evidence of rehabilitation is not as overwhelming as what this Court considered in United States v. Rodriguez, 492 F. Supp. 3d 306, 311–12 (S.D.N.Y. 2020). But the Court is not ordering immediate release, as it did in Rodriguez, but instead a modest reduction in sentence. Furthermore, rehabilitation is a qualitative evaluation, not purely quantitative as the Government seems to argue, and the evidence of Glynn's rehabilitation is substantial and meaningful.

17

§ 3553(a)(1). Glynn, through his role as the leader of a unit of the Bloods, was involved in serious acts of violence, most notably the murder of Frederick Fowler and attempted murder of Charles Myers. While Glynn may not have instigated the plot to kill Myers, he agreed to help Valentine rob and kill Myers, and recruited two of his associates to carry out the killing, including providing them each with a firearm to do so. As this Court made clear at sentencing, murder is as awful a crime as one can commit, and warrants severe punishment.

And yet, as described above, "the history and characteristics of the defendant," including his youth at the time of the offense conduct, his troubled upbringing, combined with the evidence of rehabilitation since he has been incarcerated, weigh against the sentence of life imprisonment. 18 U.S.C. § 3553(a)(1). While the challenges of Glynn's upbringing in no way excuse his serious crimes, they do provide context for understanding how he came to be desensitized to violence and to make such awful decisions. Relatively young at the time he committed the offense conduct, Glynn has since demonstrated remarkable "integrity" and a "high standard of maturity and discipline" in his diligent and consistent work in his jobs in prison and in pursuing educational and other opportunities for self-improvement. Such considerations weigh against the imposition of a life sentence.

**IV. The Nexus Requirement**

Finally, the Court asks whether there is a sentence reduction consistent with the § 3553(a) factors that is warranted by the extraordinary and compelling reasons. A motion for sentence reduction can be granted only where there is a nexus between the two because the Court may reduce a defendant's sentence only if the "extraordinary and compelling reasons warrant <u>such</u> a reduction." 18 U.S.C. § 3582(c)(1)(A)(i) (emphasis added).

While courts rarely consider this nexus requirement explicitly, it comes into focus when a court considers granting a partial reduction in sentence, rather than immediate compassionate release. Here, the nexus is apparent because the Court does not find that any risk of imminent illness or death constitutes an extraordinary and compelling circumstance. Instead, as discussed above, the Court finds that the combined facts of Glynn's recently-diagnosed chronic kidney disease, the evidence of Glynn's rehabilitation in the twenty years he has been incarcerated, and his relatively young age when the underlying offenses occurred, constitute, cumulatively, an extraordinary and compelling reason warranting a partial reduction in Glynn's sentence.

How much of a reduction these circumstances warrant is a very different inquiry, not subject to any guidelines or other prescribed calculation. Balancing these and all the relevant § 3553(a) factors, the Court finds that while releasing Glynn today

19

would be totally inconsistent with the severity of his crimes, a modest reduction in the length of his sentence is appropriate. Weighing all the evidence and arguments offered by both sides, the Court concludes that these extraordinary and compelling circumstances warrant a reduction to 420 months on all counts. The Court also concludes that such a reduction is consistent with the § 3553(a) factors. Put differently, if at the time of sentencing the Court had been aware of all the facts now known but also some of which were apparent at the time, it would have found a term of 420 months' imprisonment to be sufficient, but no greater than necessary, to achieve the purposes of criminal sentencing.

For the foregoing reasons, Glynn's motion for a reduction in sentence is granted in part, and his sentence is modified to reduce the term of imprisonment on Count One from life imprisonment to 420 months, and on Counts Two and Three from 480 months to 420 months, all to run concurrently. All other aspects of his sentence remain in full force and effect.

SO ORDERED.

Dated:    New York, NY
          February 24, 2022

JED S. RAKOFF, U.S.D.J.